STATE of Missouri, Respondent,

v.

Eloise MULLINS, Appellant.

No. WD 33202.

Missouri Court of Appeals,
Western District.

July 27, 1982.

Russell C. Still, Asst. Public Defender, Columbia, for appellant.

John Ashcroft, Atty. Gen., William K. Haas, Asst. Atty. Gen., Jefferson City, for respondent.

Before SHANGLER, P. J., and PRITCH-ARD and DIXON, JJ.

SHANGLER, Presiding Judge.

The defendant Mullins was convicted by a jury of an attempt to steal by deceit, a class D felony [§§ 564.011 and 570.030, RSMo 1978] and was sentenced to a term of five years. The defendant contends the evidence was not sufficient for conviction and that there was instruction error in the submission of the offense.

The crime involved three principals: Louella Calvin, the victim, and defendant Eloise Mullins and her confederate Diana Lamposona. The site of the encounter was the Woolco store at the Biscayne Mall in Columbia. The victim was at a Woolco counter when she was tapped on the shoulder by the defendant Mullins [a black female] with a billfold in hand, which—she told victim Calvin—she had found and wished to return to the rightful owner. Another woman nearby [a white female, Lamposona] stepped up, said she was not afraid to open the purse, and pulled out some money. [The black female was nicely dressed and attractive. The white female was excessively heavy, over two hundred pounds. The victim had no acquaintance with either of them.] The defendant Mullins [the black female] said she was employed at the Montgomery Ward office and would go there to consult with her boss as to the disposition of the money found. She asked the victim to come along as a witness that she had turned the money in. The white female said she would go along. With that, the white female opened the billfold, took out the money, held it up, restored the currency to the receptacle, and returned the billfold to the black female. The victim was able to see that the money was held by two binders, but could not tell the amount.

They entered a car [described by the victim as a yellow or tan Buick with a vinyl top] and the white female drove them to the Ward store nearby. The defendant [the black female] emerged and went into the Ward store. She returned after some fifteen minutes and explained that her boss wished to speak with each of them, one at a time. The white female went first, and after some fifteen minutes returned with information that the boss was engaged in a business meeting and could not talk to the victim for another half hour, but that the white female would convey his instructions as to what to do. The white female [Lamposona] reported that the boss had telephoned Washington, D. C. in her presence and learned that the money was illegal, that the rightful owner would not claim the funds. They were told that the boss advised the three of them to pay the taxes and then share the rest in equal parts, since they had come as witnesses. Lamposona reported also that "we had to put up some money to show that we wouldn't have to spend this money for 30 or 60 days." This, she explained was "earnest money." The defendant then asked the victim how much she could "put up as earnest money." She responded that she did not know. The white female [Lamposona] said she could put up $9,000. The victim responded that she could not furnish that much. Lamposona then asked: "[H]ow much can you put up?" She asked victim Calvin also whether she had a savings account. The victim responded that she did, but could not get to it. Lamposona then asked the victim how much there was in her check account. The victim consulted her checkbook in a manner open to the view of the other two and Lamposona then remarked: "[W]ell, you can put up $8,000." The victim refused that, but agreed to put up $7,000 and wrote out a check for that amount. The defendant then explained to the victim that she would photostat the money the victim put up and after that was done, they would return the money to her. That, the defendant explained, was the procedure described to her by her boss at the Ward office.

The check for the $7,000 executed by the victim in hand, the three drove up to the window of the Commerce Bank drive-in facility at the Biscayne Mall and tendered the instrument for cash. The victim was directed into the facility since there was not sufficient cash at the window. Lamposona accompanied the victim inside. The banker

Nix persuaded the victim Calvin for reasons of security to accept a cashier's check rather than cash. Nix attempted to probe the victim if anything was amiss to prompt the need for such a large sum. Lamposona made light of the subject and explained it was for "a business deal they were getting into, some type of business venture, and they needed the cash at that time." Lamposona then advised the victim to have the check made payable to herself and that the victim "could then endorse it over for whatever business purposes she wanted." The three then drove to another bank to cash the check; the victim and Lamposona presented the check, but they were told the check would have to be presented to the bank where the victim had an account. In this interim, the defendant [the black female] drove the car around the block. They then drove to the Commerce Bank. On the way, they stopped at a Pizza Hut because the defendant said she had to call her boss. The other two, the victim and the white female, continued to the bank. The car was parked on the business lot, and the two went up to the teller where Lamposona directed that "she'd like to have this all in large bills." The victim was referred to the vice-president, Nolke, and he asked to speak with her alone. [Nolke had been informed by the Biscayne Mall facility that the victim, depositor Calvin, had requested a sizeable check withdrawal, and Nolke directed the tellers at the main bank to alert him when she arrived to present the cashier's check for cash.] Calvin was nervous and reticent to talk. The victim told Nolke: "I wasn't supposed to tell him anything that was going on." Lamposona had warned her that the victim should not say anything to anyone. Nolke asked Calvin to remain there and dashed to the car park to confront the white female whom he had seen in the bank lobby with the victim. As he did so, Nolke spied two females, a white woman [the female he had seen in the bank lobby with the victim] and a black female [the defendant] enter a yellow car and depart rapidly. Nolke noted the license plate number and telephoned the description to the police.

Later that day a car of that description driven by a black female was stopped by the police. A very large white female lay on the back seat. The police took from the purse of the black female what appeared to be a stack of United States currency, about one-half inch in thickness, encased in a $1,000 bank wrapper, but actually composed of two outer $2 bills around a multilayer of play money. Taken from the automobile was also a black wig worn by the defendant during the encounter with the victim, and other personal accouterments. The two female occupants of the car were identified at the scene of arrest by the victim as the principals in the scheme for her money—the defendant and Lamposona. The victim was at first somewhat halting in the identification of the black female as a principal because at that confrontation she sported an afro hairstyle, and not the black wig of wavy hair [then recovered in the car] she wore during the criminal encounter.

■ The statute defines that [§ 570.030.-1]

"A person commits the crime of stealing if he appropriates property or services of another with the purpose to deprive him thereof, either without his consent or by means of deceit or coercion."

Thus, the substantive crime of stealing is accomplished by the appropriation of the property of another with the purpose to deprive that other of the property accomplished without the consent of the other, *or* by deceit, *or* by coercion.

■ The statute defines also that [§ 564.011.1]

"A person is guilty of attempt to commit an offense when, with the purpose of committing the offense, he does any act which is a substantial step towards the commission of the offense . . . ."

Thus, the substantive crime of an attempted stealing is accomplished by a purpose to steal accompanied by an act which is a substantial step towards the commission of the stealth. The New Missouri Code: A Manual for Court Related Personnel § 9.2 (1978).

The defendant Mullins was charged with and convicted of an attempt to steal by *deceit*, in concert with another, a sum of cash from the victim Calvin. The component *deceit* was defined to the jury in terms of § 570.010(7) and MAI–CR2d 33.01:

" '*Deceit*' means purposely making a representation which is false and which the actor does not believe to be true and *upon which the victim relies*, [emphasis added] as to a matter of fact, law, value, intention or other state of mind . . . ."

The defendant Mullins concedes that some representations by appellant and Lamposona to Louella Calvin were false: "There was evidence that it was implied to Calvin that appellant had found $30,000 in cash and that she worked at Montgomery Wards and that she had discussed finding the money with her boss at Montgomery Wards; [t]here was evidence presented from which it could be inferred that the appellant never found $30,000 in cash; [t]here was direct evidence that appellant was not employed at Montgomery Wards at the time of the incident." The defendant contends, nevertheless, that there was no direct evidence the victim Calvin relied on anything defendant Mullins said to induce Calvin to withdraw funds from her account to transfer to Mullins. That argument rests on these excerpts:

[Cross-examination by defense counsel]

Q. *The black lady* [defendant Mullins] *didn't do anything to persuade you to* persuade you [sic] *to turn that check over to her, did she*? [emphasis added]

A. No.

Q. She didn't do anything to persuade you to turn any money over to her either, did she?

A. No.

Q. The white lady [Lamposona] did all the persuading, didn't she?

A. Yes.

[Redirect-examination by the Prosecutor]

Q. Mrs. Calvin, the black lady told you she was an employee of Ward's, didn't she?

A. That's right.

Q. She tell you she talked to her boss in Ward's?

A. Yes.

[Recross-examination by defense counsel]

Q. Obviously, since you answered by question that the black lady did nothing to convince you to turn anything over to her, everything Mr. Jones just questioned you about, *that didn't have any effect on you turning any money over, the check over to the black lady, did it*? [emphasis added]

A. No.

■ The scheme the evidence shows was a concoction by the two females, black and white, to induce the victim to relinquish to the *white female* a $7,000 sum from a bank withdrawal. It was the *white female* only who accompanied the victim [also a white female] to each of the three bank facilities to transact the debit of the funds by cashier's check and then to attempt the negotiation for cash. It was the white female [Lamposona] who assumed to deceive the banker that the funds—needed in cash—were for a business deal. The clear sense of the scheme that the *white female* accompany the victim throughout these initiatives was to allay the suspicion otherwise probable from the consort of a *black female*. There never was any design that the victim was to transmit the check or money to the *black female* upon withdrawal of the funds, but only later to photostat the currency—a step in the progression of the scheme never reached. Thus, the testimony by the victim Calvin that the representations by defendant Mullins that she found the $30,000, was employed at the Ward office, advised with the boss there as to the proper disposition of the funds—all did not induce her "to turn any money over, the check over to the black lady [defendant]" does not amount to a concession—as the defendant argues— that Calvin was not induced to withdraw money from the account in reliance on misrepresentations by the defendant Mullins. That inference appears from the evidence that the defendant consciously separated herself from the other two at the Pizza Hut as they were enroute to the bank on the prevarication of a need to call her employer.

The charge of offense, the proof, and the submission were all of a crime perpetrated by the defendant Mullins with the aid of another [Lamposona]. The defendant was guilty of the offense if her own conduct conjoined with the conduct of another for which she was responsible amounted to an attempted stealth by deceit. [§ 562.041; MAI–CR2d 2.10]. The defendant was criminally responsible for the conduct of Lamposona under the statute if Mullins

[e]ither before or during the commission of [the] offense with the purpose of promoting the commission of [the] offense, aid[ed] or agree[d] to aid or attempt[ed] to aid [Lamposona] in planning, committing or attempting to commit the offense.

The defendant does not contend the evidence does not sustain her liability as an aide of Lamposona in the criminal enterprise. She cannot. It was the defendant who feigned the adventitious discovery of a $30,000 cash sum, the employment at the Ward office, and that her superior was ready to impart advice as to the lawful disposition of the funds. It was also the defendant herself who represented to the victim that the delivery of the $7,000 was necessary only for photostats and would be returned after that procedure. That it was Lamposona who then exploited the figment of an employer who learned from the federal authority that the money was illegal and would not be claimed, but could become the lawful property of the three females on condition that they post "earnest money" does not relieve the defendant from the onus of the inference of that proof that Calvin relied on those false representations. That the defendant Mullins acted with Lamposona to promote and aid that attempt to steal the money of the victim is an inference established by substantial evidence. Thus, the defendant was criminally responsible for the Lamposona conduct which, conjoined with her own, established a prima facie attempt to steal under the criminal statutes.

■ The inchoate offense, attempted stealing, was submitted to the jury on the model of MAI–CR2d 18.02—Attempts. That paradigm postulates, among the other components of the submission, paragraphs First and Second in these terms:

First, that (on) [date] in the (County) of _____, State of Missouri, the defendant [briefly *describe the conduct which would constitute the attempt*], and

Second, that such conduct was a substantial step toward the commission of the crime of [*name of offense with sufficient details to identify person or property involved, e.g., rape upon Susan Doe or burglary of a specific building*] and was done for the purpose of committing such [*name of offense*], (and) .... [emphasis added]

The defendant contends the instruction as submitted does not comply with the explicit direction of the paragraph First to "briefly describe the conduct which would constitute the attempt." The ample narrative of that component of instruction as given belies contention:

First, that on or about March 25, 1981 a certain person with the aid or attempted aid of defendant attempted to commit the offense of stealing money of a value of at least one hundred fifty dollars by deceit from Louella Calvin by purposely and falsely representing that $30,000 had been found and that Louella Calvin would share equally with defendant and said certain person in the division of the $30,000 if Louella Calvin would provide at least $7,000 of her own money to defendant and said certain person for the stated purposes of paying taxes on and serving as earnest money for said transaction, and defendant and said person knew these representations were false and Louella Calvin relied upon said representations and thereafter, with the assistance of defendant and said certain person Louella Calvin attempted to obtain $7,000 cash from her account to provide to defendant and said certain person, and ....

The Notes on Use for that model instruction direct also that where the attempt crime is submitted but the object crime is not [that is, where the attempt is not sub-

mitted as a lesser-included of the completed crime] a separate instruction must be given to define the object crime. The instruction as given in paragraph Second submits that the conduct described in paragraph First "was a substantial step toward the commission of the crime of stealing money of the value of at least one hundred fifty dollars by deceit from Louella Calvin." A separate instruction defined the object crime, stealing, in the terms of § 570.030. The submission upon which the jury returned the verdict of guilty was conformable to every requirement of law.

The judgment is affirmed.

All concur.